IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Andria Priestley,                              )
                                               )     Civil Action No. 6:08-546-GRA-WMC
                              Plaintiff,        )
                                               )     **REPORT OF MAGISTRATE JUDGE**
                    vs.                         )
                                               )
Michael J. Astrue,                             )
Commissioner of Social Security,               )
                                               )
                              Defendant.        )
_____)


            This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

            The plaintiff brought this action pursuant to Section 205(g) of the Social Security

Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title

II of the Social Security Act.


                        **ADMINISTRATIVE PROCEEDINGS**

            The plaintiff filed an application for disability insurance benefits (DIB) on May 1,

2002, alleging that she became unable to work on May 15, 2001. The application was denied

initially and on reconsideration by the Social Security Administration. On May 14, 2003, the

plaintiff requested a hearing. The administrative law judge (ALJ), before whom the plaintiff

and her attorney appeared on November 17, 2004, considered the case *de novo*, and on

_____

            [1]A report and recommendation is being filed in this case, in which one or both parties declined to
consent to disposition by the magistrate judge.

February 24, 2005, found that the plaintiff was not under a disability. On August 2, 2005, the Appeals Council remanded the case to the ALJ for further consideration.

A supplemental hearing was held on February 7, 2006, at which the plaintiff, her attorney, and a vocational expert appeared.  On April 18, 2006, the ALJ again found that the plaintiff was not under a disability.  This finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on December 21, 2007.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

> (2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

> (3)    The claimant's degenerative disc disease, status-post L4-5 diskectomy with revision surgery and obesity are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c)).

> (4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

> (5)    I find the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

> (6)    The claimant has the following residual functional capacity: light work, or work which involves occasionally lifting and/or carrying a maximum of 20 pounds; frequently lifting and/or carrying up to 10 pounds; and walking or standing six hours a day, or which requires sitting most of the time, but entailing pushing and/or pulling of arm and/or leg controls; with a sit/stand option.

> (7)    The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

2

(8)    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

(9)    The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

(10)    The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568).

(11)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

(12)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.20 and 202.21 as a framework for decision-making, along with vocational expert evidence, there are a significant number of jobs in the national economy that she could perform as detailed in the body of the decision.

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five

3

sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R. §404.1503(a).  *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id*.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff completed high school and one year of college (Tr. 63), and worked as a textile burler and creeler, work activity programmer, rehabilitation assistant, and mental retardation specialist (Tr. 58, 70).  She alleges that she became disabled on May 15, 2001, due to back pain radiating into her legs (Tr. 57).

The record reveals that the plaintiff injured her back when lifting her five-year-old son in late 1999 or early 2000 (Tr. 134, 202).  She developed symptoms of sciatica (back pain radiating into the legs) that failed to resolve with conservative treatment over the following year (Tr. 117-38).  She stopped working in May 2001 (Tr. 57).

Diagnostic studies showed the plaintiff had lumbar degenerative disc disease and a herniated disc, and she underwent a bilateral L4-L5 hemilaminectomy and partial diskectomy surgery on August 9, 2001 (Tr. 114-17).  Within days of the surgery, the plaintiff was "ambulating without difficulty" and her pain was controlled with medication (Tr. 114).  However, she continued to complain of pain, which never fully receded (Tr. 124-27, 138).

5

Nevertheless, treatment records from orthopedist Dr. H. Stanley Reid throughout late 2001 reflected several normal or near-normal objective findings, including normal spinal alignment, nerve roots in "good position," no evidence of recurrent herniated disc or infection, only "slightly" diminished lumbar motion, no muscle spasm or point tenderness, no radiating back pain with straight leg-raise tests, preserved strength and sensation, symmetric reflexes, normal gait, good balance, equal weight-bearing, and intact motor function (Tr. 124-28).

In December 2001, four months after the plaintiff's surgery, Dr. Reid determined that she was "suited for light duty, avoiding frequent bending, lifting up to 15 pounds occasionally and up to 10 pounds frequently. She can carry up to 15 pounds on her feet occasionally and up to 10 pounds when on her feet frequently. She should be able to push and pull 15 pounds occasionally, and 10 pounds frequently." Dr. Reid assessed an 8% whole person impairment rating (Tr. 124).

In October 2002, Dr. Edmund P. Gaines conducted a consultative evaluation in connection with the plaintiff's application for disability benefits. The plaintiff complained of persistent back pain and pain down her left leg. She said she could not sit for long periods of time, but could drive. She told Dr. Gaines she had not seen a physician since December 2001, and that she used Lortab (analgesic medication) "intermittently." The plaintiff said she cooked and cleaned, but otherwise did not cite any daily activities. During the evaluation, Dr. Gaines noted that the plaintiff was "continually moaning and sighing." Upon examination, the plaintiff weighed 233 pounds[2] and limped on the left. She had good and equal strength bilaterally in all extremities, with some limited range of motion in the hips and lumbar spine. She did not have any sensory loss, and her reflexes were normal. Dr. Gaines concluded that the plaintiff's "symptoms seem[ed] out of proportion to findings revealed on this physical examination," and suggested repeat MRI and nerve conduction studies (Tr. 138-42).

---

[2]The plaintiff's height is listed as either 5'8" or 5'10" (Tr. 139, 147).

Also in October 2002, a State agency physician (whose name could not be discerned from the signature), reviewed the plaintiff's medical records and determined that she had the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; stand/walk about six hours and sit about six hours in an eight-hour day; and occasionally climb, balance, stoop, kneel, crouch, and crawl. The physician specifically noted Dr. Gaines' notation that the plaintiff's symptoms seemed out of proportion to findings on examination, and that her pain had been considered in assessing her residual functional capacity (Tr. 166-69).

The same month, the plaintiff presented to Dr. Charles H. Hughes for an evaluation of her chronic back pain. She said she occasionally used Lortab for pain, but did not take it regularly. Dr. Hughes indicated that if the plaintiff wanted to increase her activities, she would need to have an L4-5 spinal fusion surgery, and that she was "totally incapacitated at these levels with her back pain at this time" (Tr. 176-77).

An MRI subsequently revealed a collapsed disc at L4-5 with signal changes throughout the vertebrae (Tr. 147).

In December 2002, at the request of Dr. Hughes, the plaintiff presented to orthopedist Dr. Jeffrey K. Wingate for a consultation. The plaintiff said Ultracet (analgesic medication) was her only medication, and rated her pain as 8 on a scale of one to 10 (10 being the worst pain). Dr. Wingate noted the most recent MRI findings and found on examination that the plaintiff had pain with straight leg-raise tests, diffuse tenderness, an antalgic gait, weakness in her left leg, and "severe pain." He suggested another back surgery (Tr. 178-79).

On January 14, 2003, the plaintiff underwent her second back surgery, a "revision of bilateral laminectomies at L4-5 with instrumented interbody and posterolateral fusion." Dr. Wingate noted that by the second day after surgery, she was "able to ambulate unremarkably," and by the third day, she was "comfortably ambulating" (Tr. 143-48).

7

In March 2003, the plaintiff underwent electrodiagnostic studies of her legs by orthopedist Dr. Jacquelyn F. VanDam.  The plaintiff told Dr. VanDam that her most recent surgery "did eliminate her left leg pain," but that she had subsequently developed some pain and numbness in the right leg.  The studies were abnormal, but Dr. VanDam noted that the results did not match the plaintiff's symptoms of new onset right leg numbness (Tr. 180-83).

X-rays that month revealed "excellent" grafting, and Dr. Hughes noted that although the plaintiff was worried about numbness in her legs, her x-rays "look[ed] fine" (Tr. 175).

On April 15, 2003, State agency physician Dr. Frank K. Ferrell reviewed the plaintiff's medical records and assessed her physical residual functional capacity for January 2004 (12 months after the second back surgery).  Dr. Ferrell determined that as of January 2004, the plaintiff would be able to lift 20 pounds occasionally and 10 pounds frequently; stand/walk about six hours and sit about six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl.  He also determined that she would need to avoid concentrated exposure to hazards such as machinery and heights due to give-away weakness and sensation loss in her lower extremities ((Tr. 156-63).

That month, Dr. Wingate noted that the plaintiff had applied for disability benefits, which he "would be strongly supportive of."  His objective examination findings, however, showed improving left leg strength, improved left foot drop, intermittent leg aching, and no true radicular pain.  He noted that the plaintiff "certainly seem[ed] to continue improving" (Tr. 187).

The following month, Dr. Hughes completed a "Clinical Assessment of Pain" form, in which he opined that the plaintiff had incapacitating pain that would worsen with walking, standing, bending, stooping, etc.  He also opined that pain and/or medication side effects could be expected to be severe and limit effectiveness.  Dr. Hughes further opined that the plaintiff could not perform even sedentary work, and that her restrictions had been

present since May 15, 2001 (the date the plaintiff last worked).  Dr. Hughes noted that his office notes supported his assessment (Tr. 172-74).

One month later, in June 2003, the plaintiff told Dr. Wingate that she had "extreme difficulty" getting out of a chair or walking, and Dr. Wingate noted she "hobble[d]" on her right leg.  He noted that it was "almost impossible [for the plaintiff] to do what she needs to do on a day to day basis."  A CT scan of the plaintiff's lumbar spine taken that month showed "minimal" disc bulges at two levels, surgical changes at L4-5 with adequate spinal canal size, no evidence of disc herniation, no significant mal-alignment, and normal vertebral body height (Tr. 186, 196-97).

In September 2003, Dr. Wingate noted that the plaintiff had a "solid" fusion at L4-5, and that her leg pain was more significant than her back pain.  He noted that she had a "slightly antalgic gait" (Tr. 185).

In April 2004, the plaintiff presented to primary care physician Dr. William J. Taylor for routine care.  She initially voiced "no current complaints," but then reported chronic back pain, fatigue, and difficulty concentrating.  On examination, she had mild tenderness in her lower back, with intact flexion, extension, and rotation (Tr. 200).

Dr. Wingate completed a questionnaire in August 2004, in which he opined that the plaintiff could not perform a sedentary job, would have to rest away from the work station for more than one hour at a time, would probably miss more than three days of work per month, and would have significant attention and concentration problems.  He based his opinion on "her history and her continued examination."  The same month, Dr. Wingate completed an affidavit in which he recited the plaintiff's subjective complaints about needing to change positions and take naps.  He opined in the affidavit that the plaintiff "is and has been completely and totally disabled from performing any job on a full-time basis" since 2001 (Tr. 208-13).  In November 2004, Dr. Wingate explained why he believed the plaintiff could not perform even a sedentary job:

While the CT scan shows a good fusion, and while it is highly unlikely that the nerve is still compressed, it [is] certain that there is permanent damage to the nerve, residual to the compression of the nerve, which continued for an extended period of time and was fairly significant. We know this because she continues to have both paraesthesias in the radicular pattern that would be expected from nerve damage and muscular weakness in a pattern that would be expected from nerve damage. It has been long enough after the fusion operation that further improvement in her condition is unlikely.

I generally examine her after she has ridden about 3 hours in a car; this is good evidence of what her condition would be if she tried to perform sedentary work for similar or perhaps somewhat longer periods. When I examine her after that trip, she is in obvious pain, obviously uncomfortable and fidgety, with sciatic tension signs that indicate her nerves are still inflamed.

***

Ms. Priestley has been at least this impaired during the time I have treated her, and has almost certainly been at least this disabled for some time before her first examination by Dr. Hughes in October 2002; indeed one would expect, with some confidence, that a damaged nerve under compression, as it was before that surgery, would function more poorly than the same nerve once the compression was removed, as it now has been.

(Tr. 207).

In November 2004, Dr. Wingate wrote a letter stating that the plaintiff had "good fusion," and that it was "highly unlikely" that a nerve was still compressed, but that there was some nerve damage and muscular weakness as a result. Dr. Wingate opined that it would be "difficult for [the plaintiff] to complete any 8 hour period of activity without having to lie down and rest for several hours; and she would almost certainly have to miss more than 3 days of work per month." He further opined that the plaintiff had been disabled "for some time before her first examination by Dr. Hughes in October 2002" (Tr. 207).

A CT scan of the plaintiff's lumbar spine taken in April 2005 revealed "very mild" disc bulges at L2-3 and L3-4, osteophytes (bone spurs) not contacting exiting nerve roots at L4-5, and a "mild" disc bulge at L5-S1. Her spinal hardware was intact (Tr. 214-15).

10

In October 2005, following the Appeals Council's remand of the case to the ALJ, the plaintiff underwent a disability evaluation by Dr. W. Russell Rowland. The plaintiff rated her pain as 9 on a scale of one to 10, most of the time. She reported that she spent much of her typical day in bed due to pain. As to her other activities, she reported doing some cooking, straightening up her bedroom, and driving. On examination, the plaintiff was mildly depressed, weighed 226 pounds, had a normal gait, and used no assistive walking devices. She had normal upper extremity strength and range of motion, reduced flexion in her hips but otherwise normal range of motion in them, reduced lumbar range of motion, and no lumbar tenderness. Seated straight leg-raise tests were negative (normal) bilaterally, and the plaintiff was able to walk on her heels and toes and tandem-walk. She had decreased sensation in her lower legs (Tr. 257-61). Dr. Rowland subsequently completed a Medical Source Statement in which he opined that the plaintiff could lift 20 pounds occasionally; stand/walk less than two hours in an eight-hour day; sit less than six hours in an eight-hour day; occasionally stoop; and never climb, balance, kneel, crouch, or crawl. He also opined that the plaintiff required limited exposure to vibration and hazards (Tr. 264-67).

At the February 7, 2006 (post-remand) hearing, the plaintiff testified that on a typical day, she woke up her children and then went back to bed for five out of eight hours (Tr. 310). She testified that she drove a car and picked her children up from school, then went back to bed (Tr. 312-13). The ALJ observed that the plaintiff had "entered normally, seem[ed] to sit with ease, look[ed] her apparent age, use[d] no walking device, [and] answer[ed] alertly" (Tr. 312). The plaintiff testified that she could walk for 10 minutes, stand five to 10 minutes, and sit five minutes at a time, and needed to shift positions (Tr. 314). She said that she could not lift a gallon of milk without pain (Tr. 315).

Vocational expert Carey Washington testified that a hypothetical individual of the plaintiff's age, education, and work experience, with no transferrable skills, who required

11

a sit/stand option and "either sedentary or light[3] lifting requirements" could perform the light jobs of marker (DOT[4] 209.587-034, 6,000 to 8,000 jobs in the State) and folder/inspector (DOT 789.587-014, 8,000 to 12,000 jobs in the state), and the supposedly "sedentary"[5] job of weigher (DOT 929.687-062, 6,000 to 8,000 jobs in the state) (Tr. 316-17).  Mr. Washington testified, however, that an individual who would miss more than three days of work per month, have to lie down and rest several hours, or have attention and concentration problems sufficient to interrupt tasks, could not perform those jobs or any other work ( Tr. 318-19).

The plaintiff submitted additional evidence to the Appeals Council.  However, some of the evidence was not included in the transcript, although it was submitted to and received by the Appeals Council (pl. brief, ex. A at 1). That evidence consists of the following:

In August 2006, Dr. Hughes wrote that the plaintiff had had good results from her fusion "in the sense that the bones of those vertebrae seemed to be proceeding to fuse together." He noted:

> [O]peration on bone cannot always restore an already damaged nerve to a pre-injury state. After reviewing Dr. Wingate's records, it is clear that in his case, the ultimate outcome was a poor one, most probably because of the damage to the nerve, which occurred prior to the fusion, had progressed so far that its function remained significantly impaired.

(pl. brief, ex. A at 9).

In August 2006, Dr. Carol Kooistra performed a nerve conduction study. The right peroneal CMAP amplitudes were reduced, the left peroneal and right sural DSLs were mildly prolonged, the left S1 DEP was prolonged, and the left tibial F-wave and H-Reflex were absent. The impression was of left L5-S1 radiculopathy.  In October 2006, Dr. Kooistra

---

[3]*See* 20 C.F.R. §§ 404.1567(a) (definition of sedentary work), 404.1567(b) (definition of light work).

[4]U.S. Dept. Of Labor, *Dictionary of Occupational Titles* (4th ed. Rev. 1991) (DOT).

[5]Although the vocational expert identified this job as sedentary, it is actually medium according to the DOT, and as such, would exceed the plaintiff's residual functional capacity. *See* DOT 929.687-062 (weigher); 20 C.F.R. § 404.1567(c) (definition of medium work).

explained her August 2006 EMG/nerve conduction study. She stated that when certain signals are absent, it indicates that there as been some significant damage in the nerve fibers. In this case, given "[The plaintiff's] history of nerve entrapment at the nerve root exit, it is almost certainly indicative of nerve damage at that point." Dr. Kooistra noted that if the nerve "compression has been intense or prolonged, the damage can remain even though the compression ends." Such damage often leads to nerve pain and most probably has done so here. The doctor concluded that "[i]n light of the fact that the nerve impingement probably caused the problem, it is also my opinion that she has suffered from this problem since the date of her surgery." Dr. Kooistra further concluded that the plaintiff could not even work at a sedentary job, would need to rest more than one hour each day, would miss more than three days per month, and would have trouble with attention and concentration sufficient to interrupt tasks (pl. brief, ex. A at 4-8).

## ANALYSIS

The plaintiff alleges disability since May 15, 2001, due to back pain radiating into her legs, obesity, depression, and sleep dysfunction. She was 38 years old as of the date of the ALJ's decision. The plaintiff has a high school education, one year of college, and past relevant work as a rehabilitation assistant, burler, and creeler. The ALJ found that the plaintiff had the following residual functional capacity ("RFC"): light work, or work which involves occasionally lifting and/or carrying a maximum of 20 pounds; frequently lifting and/or carrying up to 10 pounds; and walking or standing six hours a day, or which requires sitting most of the time, but entailing pushing and/or pulling of arm and/or leg controls; with a sit/stand option. The ALJ determined that the plaintiff could perform the jobs of marker, folder/inspector, and weigher. The plaintiff argues that the ALJ erred by (1) failing to give proper weight to the opinions of her treating physicians; (2) failing to properly evaluate her credibility; and (3) failing to comply with SSR 02-01p in not considering the impact of her

13

obesity on her ability to work.  The plaintiff also contends that remand is appropriate for consideration of new and material evidence.

### Treating Physicians

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case.  *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination.  SSR 96-2p.  Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors:  (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion.  20 C.F.R. § 404.1527(d)(2)-(5).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion.  SSR 96-2p, 1996 WL 374188, *5.  As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to

> deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id*. 1996 WL 374188, *4.

The plaintiff argues that the ALJ failed to properly consider the opinions of two treating orthopedic surgeons, Drs. Hughes and Wingate, and one examining agency consultant, Dr. Rowland.  In January 2003, orthopedic surgeon Dr. Wingate performed revision bilateral laminectomies at L4-5 with instrumented interbody and posterolateral fusion (Tr. 143).  Four months later, Dr. Hughes, the orthopedic surgeon who had treated the plaintiff since October 2002 and had referred her to Dr. Wingate for surgery, stated that based on her MRIs, x-rays, surgical findings, and nerve conduction studies, the plaintiff was not capable of performing full-time work even at the sedentary level.  Her pain was "profound and intractable," so that it "virtually incapacitates" her (Tr. 172-74).  In August 2004, Dr. Wingate stated that because of her sciatica, low back pain, and lumbar disc displacement and degeneration, the plaintiff could not perform even sedentary work, would have to rest away from her work area for significantly more than an hour, would miss more than three days of work per month, and would have problems with attention and concentration sufficient to interrupt tasks (Tr. 208-209).  He provided an affidavit stating that her "subjective symptoms were completely consistent with her objectively diagnosed medical problems," and that based on his medical education, experience, and specific knowledge of the plaintiff's problems and treatment history she was totally disabled (Tr. 210-13).  In November 2004, Dr. Wingate wrote a letter stating that the plaintiff had "good fusion," and that it was "highly unlikely" that a nerve was still compressed, but that there was some nerve damage and muscular weakness as a result.  Dr. Wingate opined that it would be "difficult for [the plaintiff] to complete any 8 hour period of activity without having to lie down and rest for several hours; and she would almost certainly have to miss more than 3 days of work per month."  He further

15

opined that the plaintiff had been disabled "for some time before her first examination by Dr. Hughes in October 2002" (Tr. 207).

The ALJ found that the conclusions of Dr. Hughes and Wingate were "in direct contrast to their own treatment notes which show limited abnormal clinical findings and diagnostic testing which shows good positioning of the claimant's hardware and mild degenerative changes" and, thus, he gave their opinions "little to no weight" (Tr. 21). However, as argued by the plaintiff, evidence in the record does support these treating physicians' findings. For example, in March 2003, Dr. Hughes noted that the plaintiff was worried about "all the numbness in her legs and giving away." Although her x-rays looked fine, he ordered EMGs and nerve conductions to make sure she was not developing a neuropathy. The nerve conduction study showed abnormalities in the peroneal nerves bilaterally in addition to reduced responses in the sensory studies of the lower extremities. Dr. VanDam noted that the NCV findings on the peroneal nerves matched the plaintiff's symptoms (Tr. 175, 180-83). However, the ALJ cited only the normal x-rays, ignoring the evidence supporting her pain (Tr. 21). In June 2003, the plaintiff had low back pain radiating down both legs with extreme difficulty just getting out of a chair or walking. Her gait was extremely antalgic. Dr. Wingate stated that "[s]he's doing terribly at 5 months postop." In September, she had "tremendous" pain in her leg and back, although the leg pain was more significant. She had pain even sitting" (Tr. 185-86).

In April 2004, Dr. Wingate noted that the plaintiff had significant discomfort sitting and rising from the sitting position and pain bilaterally with straight leg raising and that she "certainly has a component of congenital stenosis with neuroforaminal narrowing at multiple levels." He diagnosed bilateral lumbar radiculitis, stating that her surgical procedure had addressed only the recurrent disc herniation and instability (Tr. 184).

Further, the treating physicians' opinions are not inconsistent with the limitations imposed by Dr. Rowland, a post-hearing agency consultant. In October 2005, following the

16

Appeals Council's remand of the case to the ALJ, the plaintiff underwent a disability evaluation by Dr. Rowland. Dr. Rowland subsequently completed a Medical Source Statement in which he opined that the plaintiff could lift 20 pounds occasionally; stand/walk *less than* two hours in an eight-hour day; sit *less than* six hours in an eight-hour day; occasionally stoop; and never climb, balance, kneel, crouch, or crawl. He also opined that the plaintiff required limited exposure to vibration and hazards (Tr. 264-67) (emphasis added).

The ALJ describes Dr. Rowland's opinion as showing a "reduced level of light work" (Tr. 22). The ALJ gave Dr. Rowland's opinion partial weight because he claimed the evidence "clearly shows that the claimant is capable of the full range of light work with a sit/stand option" (Tr. 22). However, as pointed out by the plaintiff, the inability to stand and/or walk for even two hours a day precludes the ability to perform light work: "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs." SSR 83-10, 1983 WL 31251, *5.

The ALJ gave the opinion of Dr. Reid, an orthopedist who performed the plaintiff's first surgery, "significant weight" (Tr. 20). In December 2001, four months after the plaintiff's surgery, Dr. Reid determined that the plaintiff was "suited for light duty, avoiding frequent bending, lifting up to 15 pounds occasionally and up to 10 pounds frequently. She can carry up to 15 pounds on her feet occasionally and up to 10 pounds when on her feet frequently. She should be able to push and pull 15 pounds occasionally, and 10 pounds frequently" (Tr. 124). However, this opinion was given prior to the plaintiff's second surgery on the same disc and prior to the nerve conduction test and, thus, the opinion is not based on all of the evidence. Furthermore, the ALJ found that the plaintiff could occasionally lift and/or carry a maximum of 20 pounds (Tr. 26). Even Dr. Reid, the only examining physician

17

who found the plaintiff is able to perform competitive work, found that the plaintiff could only lift and push/pull up to 15 pounds occasionally.

Based upon the foregoing, this court finds that substantial evidence does not support the ALJ's assessment of the medical opinions and his subsequent RFC finding. Accordingly, upon remand, the ALJ should be instructed to reconsider the opinions of Drs. Hughes and Wingate in accordance with the above law and in light of all the evidence of record.

### *Credibility*

The plaintiff next argues that the ALJ failed to properly assess her credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . .  It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."

18

Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)  the individual's daily activities;

(2)  the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)  factors that precipitate and aggravate the symptoms;

(4)  the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)  treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)  any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)  any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ determined that the plaintiff's degenerative disc disease, status-post L4-5 diskectomy with revision surgery, and obesity were severe impairments (Tr. 20).  The ALJ further found the plaintiff's "allegations regarding her limitations are not totally credible . . . " (Tr. 26).  However, the ALJ failed to make the required threshold finding that objective medical evidence shows the existence of a medical impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged.  In the body of the decision, the ALJ stated that the "evidence does not show significant strength deficits, circulatory compromise, neurological deficits, muscle spasms, atrophy or change in weight, which are reliable

indicators of long-standing, severe or intense pain" (Tr. 23). Here, it appears that the ALJ disregarded the plaintiff's complaints regarding the severity of her pain based solely on certain objective medical evidence he found lacking. In SSR 96-7p, the Social Security Administration stated:

> [A]llegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. A report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility. However, the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.

1996 WL 374186, *6.

Based upon the foregoing, the ALJ should be instructed to follow the two-step process set forth above and to consider all of the evidence in the case record[6] in making his credibility determination.

### Obesity

Next, the plaintiff contends that the ALJ failed to properly consider her obesity in accordance with SSR 02-1p. SSR 02-01p recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. SSR 02-01p, 2000 WL 628049, *6. The Ruling further states that "individuals

---

[6]The evidence to be considered includes, but is not limited to, medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by treating or examining physicians and other medical sources; and statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The Ruling also states:

> The combined effects if obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

The ALJ found as follows:

> In reviewing the evidence of record, I have noted that the claimant's medical records show diagnoses of obesity. At the claimant's consultative examination in October 2002, her height was measured at five foot, eight inches, and her weight was measured at 233 pounds. Therefore, I have considered this condition when determining the claimant's residual functional capacity.

(Tr. 22).

Here, while the ALJ stated he considered the plaintiff's obesity when determining her RFC, he failed to provide any explanation as to how this severe impairment factored into his assessment. Accordingly, upon remand, the ALJ should be instructed to "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." SSR 02-01p, 2000 WL 628049, *7.

### Evidence Submitted to Appeals Council

The plaintiff submitted additional evidence to the Appeals Council. However, some of the evidence was not included in the transcript, although it was submitted to and received by the Appeals Council (pl. brief, ex. A at 1; Tr. 6A, 8). The court can order the Commissioner to consider additional evidence upon a showing that there is new evidence that is material and there is good cause for the failure to incorporate such evidence into the

21

record in a prior proceeding.  42 U.S.C. § 405(g).  The evidence submitted to but not considered by the Appeals Council consists of an opinion and examination notes from neurologist Dr. Kooistra and an opinion from treating physician Dr. Hughes.  As noted above, the evidence was submitted to the Appeals Council, but it was neither reviewed by the Appeals Council nor included in the transcript (Tr. 8).  Further, the evidence did not exist at the time of the ALJ's decision (the nerve conduction test was performed by Dr. Kooistra in August 2006, Dr. Hughes' opinion is dated in August 2006, and the ALJ's decision was in April 2006).  Further, the evidence is material in that it provides explanations from a treating physician and an examining physician reconciling the plaintiff's successful bone fusion with the remaining neuropathy and providing evidence the plaintiff suffered from neuropathy during he relevant time period.

In *Harmon v. Apfel*, 103 F.Supp.2d 869 (D.S.C. 2000), the Honorable David C. Norton, United States District Judge,[7] stated:

> [A]lthough the Appeals Council's decision whether to grant or deny review of an ALJ's decision may be discretionary as well as unreviewable, and the regulations do not require the Appeals Council to articulate a reason for its decision not to grant review, a reviewing court cannot discharge its statutory function of determining whether the findings of the Commissioner are supported by substantial evidence when the Appeals Council considered evidence that the ALJ did not have the opportunity to weigh, and rejected that new, additional evidence without specifying a reason for rejecting it or explicitly indicating the weight given to the evidence.

*Id.* at 874.

Here, the ALJ did not have the benefit of considering this evidence.  As the Appeals Council apparently did not consider the evidence and certainly gave no reason for its rejection of the evidence, this court cannot say that substantial evidence supports the Commissioner's findings.  *See Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980) ("The

---

[7]Judge Norton is now the Chief Judge for the District of South Carolina.

Appeals Council's failure to make specific findings concerning it was reversible error. Unless the Secretary explicitly indicates the weight given to all the relevant evidence, we cannot determine on review whether the findings are supported by substantial evidence.") (citations omitted).  Based upon the foregoing, upon remand, the ALJ should consider the foregoing evidence, along with all the other evidence in the record, and articulate his assessment of the foregoing evidence, so that this court may determine whether the Commissioner's decision is supported by substantial evidence.  *See King v. Barnhart*, 415 F.Supp.2d 607, 610-11 (E.D.N.C. 2005) ("If, upon consideration of the entire record, including the new evidence, the district court cannot conclude that the ALJ's decision was supported by substantial evidence, remand should be ordered.  If, for example, the new evidence contains an opinion of a treating physician that claimant was disabled, that opinion not having been addressed or contradicted by other evidence in the record, the great weight accorded to such an opinion would require remand.").

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

May 8, 2009

Greenville, South Carolina

23